IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

KEVIN MATTHEWS                                                      PLAINTIFF

V.                                          CIVIL ACTION NO. 4:24-CV-49-SA-JMV

LEFLORE COUNTY, MISSISSIPPI, et al.                                DEFENDANTS

ORDER AND MEMORANDUM OPINION

On May 15, 2024, Kevin Matthews initiated this litigation by filing his Complaint [1] against Leflore County, Mississippi; the Leflore County Board of Supervisors; Chancery Clerk and County Administrator Johnny Gary; Board Member Robert Collins; Board Member Eric Mitchell; and Board Member Reginald Moore. In a previous ruling, the Court dismissed Matthews' claims against the Board of Supervisors, as well as his official capacity claims against Gary, Collins, Mitchell, and Moore. *See* [46] at p. 9-10. Further, the Court identified issues with the Complaint [1] and provided Matthews an opportunity to amend.

Matthews has since filed an Amended Complaint [47], which is now the operative complaint. Gary, Collins, Mitchell, and Moore (collectively "the Individual Defendants") have filed a Motion for Judgment on the Pleadings [51], and the County has filed its own Motion [53] seeking the same relief. Both Motions [51, 53] have been fully briefed and are now ripe for review. Having considered the filings, along with the applicable authorities, the Court is prepared to rule.

*Factual and Procedural Background*

This lawsuit concerns the termination of Matthews' relatively longstanding employment with Leflore County. In April 2014, Matthews began his employment as a maintenance employee with the County. At the time of his termination almost a decade later on August 31, 2023, he held the position of central maintenance technician.

To provide some context, Gary was at all pertinent times the Leflore County Chancery Clerk and County Administrator. Robert Collins, Eric Mitchell, and Reginald Moore were three of the five members of the Leflore County Board of Supervisors.

As Matthews phrased it in his Amended Complaint [47], "[i]n the year of [his] termination, [he] had been very vocal regarding the performance and ethics of Defendant Leflore County and its Board of Supervisors Defendants Moore, Collins, and Mitchell." [47] at p. 4. He alleges that he supported the political opponents of all four of the Individual Defendants in the 2023 primary elections and goes on to point out that he "had a billboard on his private property which held campaign signs for the opposing candidates of Defendants Gary, Moore, and Mitchell." *Id*. Further describing the speech in which he engaged, Matthews' Amended Complaint [47] alleges:

The Plaintiff made several public verbal statements and social media posts regarding the

 a.   performance of Defendant Collins including repeated flooding operability [sic] of county flood control pumps in District 5;

 b.   Board President Reginal Moore being charge[d] with multiple Driving Under the Influence of Intoxicating Substances while in office;

 c.   Misuse of county equipment to build a private road that leads to a restaurant owned by Supervisor Eric Mitchell in District 4;

 d.   Plaintiff also made a statement regarding Robert Collins's participation in a grievance hearing of an employee who qualified to run against him in the 2023 democratic primary election and his subsequent voting to terminate that employee in June 2023. The Plaintiff also attended the employee's grievance hearing;

 e.   Defendant Leflore County secretly hired someone for the Assistant Purchasing Clerk Position without advertising the position to the public;

2

> f.  A social media [post of] side by side ATVs purchased for Board of Supervisors, which was viewed by Plaintiff as wasted assets of an already financially strained county.

*Id*. at p. 4-5.

Matthews attached copies of the relevant social media posts as a collective exhibit to the Amended Complaint [47].[1]

According to Matthews, around this time, Collins, Moore, and Mitchell began to "put pressure" on Gary and ultimately "threatened not to reappoint [him] as County Administrator in 2024 if he did not terminate [Matthews]." *Id*. at p. 5. After Gary and Matthews had an "informal discussion regarding [Matthews'] public comments[,]" Gary allegedly placed Matthews under the direct supervision of another employee, Ted Turner, who acted as Matthews' immediate superior through the date of his eventual termination. *Id*. at p. 5-6. Matthews alleges that he continued actively campaigning for the opponents of the Individual Defendants through the August 8, 2023 primary election.

On August 30, 2023, Matthews was involved in a verbal altercation at the Leflore County Circuit Clerk's office, which he describes as follows:

20.

> On August 30, 2023, while on his lunch break, the Plaintiff entered the Circuit Clerk's office again, to inquire about getting a stack of voter's registration cards. However, Plaintiff misspoke and stated absentee ballots. Plaintiff then clarified and told [Circuit Clerk Elmus] Stockstill, that he misspoke referring to the voter's registration cards he had asked for before for a voter's registration drive in the "Snowden Jones" apartment complex area. At that point Stockstill then said, "I know what you[] need" and then handed the Plaintiff a stack of marriage licenses. He then proceeded to tell Plaintiff "What you need to do is go ahead and marry that woman you are with." Plaintiff and Stockstill had no personal relationship and had never engaged in any personal conversations. Because

---

[1] The Court will hereinafter walk through the social media posts to provide a more detailed explanation of them.

3

> Plaintiff's expressed views about Stockstill's interference in the Leflore County, August 8, 2023, primary election, they were minimally cordial at best.

> 21.

> Notably, both Defendants Gary and Mitchell were in an ongoing election contest against candidates Plaintiff supported, and two days prior to Plaintiff's termination, the two candidates filed election challenges, which accused the Circuit Clerk Stockstill of mishandling absentee ballots to the benefit of Defendants Gary and Mitchell. . .

> 22.

> When Stockstill began his personal attack on Plaintiff, Plaintiff became frustrated and began to walk out of the Circuit Clerk's office. Stockstill came around the office counter and followed Plaintiff. The Circuit Clerk placed his hands on Plaintiff's arm in a manner of pushing him out of the door and began pushing the door on Plaintiff. At that point, a verbal altercation [ensued] between the Clerk and Plaintiff which was instigated by the Circuit Clerk's actions. Plaintiff eventually left the building with no incident.

*Id.* at p. 7-8.

The following day, Matthews was hand-delivered a termination letter signed by Gary. The letter specifically advised Matthews that he was being terminated for causing a disturbance in the Circuit Clerk's office: "[o]n August 30, 2023 at approximately 10:34 AM, you walked into the Circuit Clerk's office/courthouse whereas a disturbance was created causing security/on duty deputies to intervene and restore peace while escorting you out of the building." [47], Ex. 3 at p. 1. The letter went on to cite the provision of the Leflore County Handbook that Matthews allegedly violated. It also advised him of the procedure to seek recourse if he disagreed with the termination decision. Attached to the termination letter was an unsigned disciplinary action report containing the following explanation regarding Matthews' termination:

> On August 30, 2023 at approximately 10:34 AM, Kevin Mattews walked into the Circuit Clerk's office in a very loud voice requesting

> 50 absentee ballots. Elmus Stockstill, Leflore County Circuit Clerk informed Kevin that he did not have any absentee ballots and Kevin Matthews became very irate. Kevin Matthews continued with his irate behavior throughout the hallway of the courthouse until deputies escorted him from the building. Kevin was in violation of the Leflore County Handbook, pg. 2 that states, "The County is committed to working with employees to maintain a work environment free from violence, intimidation, and other disruptive behavior[."] This type of behavior is not acceptable and results in the termination of Kevin Matthews.

[47], Ex. 3 at p. 2.

Notably, the report also indicates that it contains "attachments" including "statements from Elmus Stockstill, his staff and the on duty deputies." *Id*. But, according to the Amended Complaint [47], no attachments were provided to Matthews when the termination letter was delivered to him.

On September 1, 2023, Matthews' attorney, Vallrie Dorsey, hand-delivered to Gary a letter regarding the termination decision. The letter specifically advised Gary of Matthews' awareness that on August 30, 2023, Gary met with three members of the Board of Supervisors "regarding Mr. Matthews and decided to terminate [him] regarding this incident in a secret meeting in violation of the Open Meetings Act." [47], Ex. 5 at p. 1. The letter then specifically requests "both a meeting with the County Administrator and subsequent meeting with the Leflore County Board of Supervisors[.]" *Id*. It also requests the documentation and statements that were purportedly to be included with the disciplinary action report regarding the August 30, 2023 incident.

On September 13, 2023, Leflore County, through its counsel (Kelvin Pulley), responded via letter and specifically advised Dorsey (on Matthews' behalf) that "[t]he supervisors will honor the request of Mr. Matthews and he may be heard at the next regular scheduled board meeting on Monday, September 25, 2023. However, this will not be a hearing. Due process is not afforded to at-will employees neither under Mississippi law nor the Leflore County Employee Handbook." [47], Ex. 4 at p. 2.

On September 25, 2023, Dorsey emailed Pulley, apparently to memorialize an earlier conversation. In that email, Dorsey stated:

> Per our conversation, it is my understanding that Mr. Matthews is on the board's agenda, but not as a hearing. We had a brief discussion about the handbook, and the county's normal course of action of allowing a hearing for aggrieved employees.
>
> Earlier, you stated that you would contact each supervisor to clarify whether Mr. Matthews would be allowed to have a reinstatement hearing, where a court reporter could be present, and full facts and witnesses could be presented to the board. Based on our most recent conversation, you are unable to reach the board to get a consensus on that as they are preoccupied with other matters for tonight's meeting. I agree to his appearance before the board being moved to a later date to first determine whether a hearing will be granted.
>
> It would not be fruitful to appear today simply to make a statement, with no action from the board. I appreciate you taking the liberty to provide each board member with a copy of the request, so that a vote can be made to determine whether the reinstatement hearing will be granted prior to appearing before the board. I also appreciate your guarantee that regardless of the outcome of the hearing request, that Mr. Matthews will still be afforded the opportunity to appear before the board on this matter at a later date. I look forward to hearing from you in this regard.

[47], Ex. 6 at p. 1.

Consequently, Matthews did not appear before the Board on September 25, 2023. He contends that the Board ultimately refused to provide him the requested grievance hearing "which had been the customary practice of the county for years." [47] at p. 12.

This lawsuit eventually followed. In the Amended Complaint [47], Matthews asserts First Amendment retaliation claims against the County and the Individual Defendants, as well as a malicious interference with employment claim against the Individual Defendants. He alleges that he was terminated because he engaged in protected speech—namely, supporting political opponents of the Individual Defendants and making social media posts critical of their

performance and the Board as a whole. Through the present Motions [51, 53], the Defendants seek judgment on the pleadings in their favor as to all claims.

*Standard*

"In considering a motion for judgment on the pleadings under Rule 12(c), the court is generally limited to 'the contents of the pleadings, including attachments thereto.'" *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)). "If . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d).

"The 'pleadings' include the complaint, answer to the complaint, and 'if the court orders one, a reply to an answer.'" *Bosarge*, 796 F.3d at 440 (quoting FED. R. CIV. P. 7(a)). Documents attached to a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c) are also considered part of the pleadings "if they are referred to in the plaintiff's complaint and central to [his] claim." *Id.* (citing *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)).

In addition to the pleadings and their attachments, on a motion under Rule 12(c), the Court may consider matters of public record and any matters of which it may take judicial notice. *D.M. v. Forrest Cnty. Sheriff's Dep't*, 2020 WL 4873486, at *2 (S.D. Miss. Aug. 19, 2020) (citing *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir. 1995); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)).

*Analysis and Discussion*

The Amended Complaint [47] asserts three claims: Count 1 - First Amendment retaliation against Leflore County; Count 2 - malicious interference with employment against the Individual

7

Defendants; and Count 3 - First Amendment retaliation against the Individual Defendants. Through the present Motions [51, 53], the Defendants seek dismissal of all claims. After addressing a preliminary matter, the Court will turn to the merits of Matthews' First Amendment retaliation claims and then to his malicious interference with employment claim.

     *I.       Preliminary Matter*

Before considering the substance of Matthews' First Amendment retaliation claims, the Court finds it appropriate to address an argument raised by Collins, Mitchell, and Moore. They contend that Gary, in his role as County Administrator, made the termination decision and that they, as Board members, had no personal involvement, which mandates dismissal of the individual capacity claims against them to the extent Matthews seeks to simply impute Gary's termination decision to them.

On this point, Collins, Mitchell, and Moore point out that "all documents related to Plaintiff's termination make patently clear that Plaintiff was terminated not by the Board of Supervisors but by the County [Administrator.]" [52] at p. 17. They go on to argue that "personal involvement is an essential element of a civil rights cause of action." [52] at p. 16.

While true that a government official must be personally involved for individual liability to attach, the fact that Gary made the ultimate termination decision does not *ipso facto* absolve Collins, Mitchell, and Moore of liability. In a 2018 decision, the Fifth Circuit, after walking through some uncertainty in previous holdings on the topic, specifically concluded that nonfinal decisionmakers *can* be held individually liable on claims of First Amendment retaliation. *Sims v. City of Madisonville*, 894 F.3d 632, 641 (5th Cir. 2018). In reaching this conclusion, the Fifth Circuit made clear that some of its previous decisions, such as *Beattie v. Madison Cnty. Sch. Dist.*,

8

254 F.3d 595 (5th Cir. 2001), and *Johnson v. La.*, 369 F.3d 826, 831 (5th Cir. 2004), did not preclude these types of claims:

> *Beattie*, *Johnson*, and subsequent cases thus inadvertently created the uncertainty we have recognized in this area. We now provide the overdue clarification. Because it is at odds with our earlier holding in *Jett*, *Johnson*'s absolute bar on First Amendment liability for those who are not final decisionmakers is not binding. Nor are the imputation principles of cat's paw liability applicable to an effort to hold a nondecisionmaker liable. *Jett*'s 'causal link' standard sets the causation requirement for a suit against an individual defendant with retaliatory motives who does not make the final employment decision.

*Id.* (citations omitted).

In short, the Fifth Circuit's decision adopted the same rule that "numerous courts of appeals have recognized," which is that "individual liability for a government official who violates constitutional rights, including First Amendment ones, turns on traditional tort principles of 'but-for' causation. If an individual defendant's animus against a coworker's exercise of First Amendment rights is a link in the causal chain that leads to a plaintiff's firing, the individual may be liable *even if [he] is not the final decisionmaker*." *Id.* at 639 (citations omitted; emphasis added).

Recognizing this precedent, the Court rejects the Defendants' threshold argument that Collins, Mitchell, and Moore cannot be held individually liable simply because it was Gary who made the final termination decision. Conversely, *Sims* does not automatically impute individual liability to them either.

Instead, the relevant inquiry mandates a deeper dive into the allegations of the Amended Complaint [47] and, specifically, whether Matthews has alleged sufficient facts to causally link Collins, Mitchell, and Moore's conduct to the ultimate termination decision. The Court will address that issue in greater detail when analyzing the Defendants' specific merits arguments for dismissal.

*II.     Federal Claims*

Having rejected that initial argument, the Court turns to the substance of Matthews' federal claims. Again, pursuant to Section 1983, he brings First Amendment retaliation claims against the County (Count 1) and the Individual Defendants (Count 3).

*A.     Section 1983 Generally*

"Regarding Section 1983, the United States Supreme Court has held that the statute's 'very purpose . . . was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action *under color of state law.*'" *Alexander v. McAdams*, 2017 WL 5642328, at *3 (N.D. Miss. Apr. 18, 2017) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, L. Ed. 2d 705 (1972)) (emphasis in original). In order to state a claim under Section 1983, a plaintiff must "(1) allege he has been deprived of a right secured by the United States Constitution or the laws of the United States; and (2) demonstrate that the alleged violation was committed by a person acting under color of state law." *Weeks v. Thompson*, 2007 WL 316261, at *2 (N.D. Miss. Jan. 31, 2007) (citing *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005)).

There is no debate that different standards are applicable to a Section 1983 claim against a municipality and an individual capacity claim against a municipal employee. *See Weeks*, 2007 WL 316261 at *2 ("Municipal liability under section 1983 requires proof of (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose 'moving force' is the policy or custom."); *Mangieri v. Clifton*, 29 F.3d 1012, 1015 (5th Cir. 1994) (holding that law enforcement officers are entitled to qualified immunity "unless it is shown that, at the time of the incident, [the officer] violated a clearly established constitutional right."). However, regardless of whether a plaintiff seeks to impose liability against a municipality or against a government official in his

10

individual capacity, the plaintiff must establish a constitutional violation. *See Thompson v. Beasley*, 309 F.R.D. 236, 249-50 (N.D. Miss. 2015).

In other words, regardless of whether seeking to impose liability against the County or individual liability (and overcome the qualified immunity defense) against the Individual Defendants, Matthews must sufficiently allege a constitutional violation. The Court will therefore first address whether he has done so.

### B. Constitutional Violation

"The Supreme Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *McAdams v. Ladner*, 608 F. Supp. 3d 416, 423 (S.D. Miss. 2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)) (internal quotation marks omitted). "The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on a matter of public concern." *Brown v. Bd. of Trs. Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581, 597 (S.D. Tex. 2012) (citing *Davis v. McKinney*, 518 F.3d 304, 311 (5th Cir. 2008)).

In order to properly plead a First Amendment retaliation claim, Matthews must plead that: "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Johnson v. Miller*, 126 F.4th 1020, 1029 (5th Cir. 2020) (quoting *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015)).

The first element is easily satisfied as Matthews alleges that his employment was terminated. *See id.* ("[Plaintiff] has pleaded that he suffered an adverse employment action, as he was terminated from his position[.]").

11

Regarding the second element, "[f]or an employee's speech to be entitled to First Amendment protection, he must be speaking as a citizen on a matter of public concern." *Brown v. Leflore Cnty., Miss.*, 150 F. Supp. 3d 753, 761 (N.D. Miss. 2015) (quoting *Graziosi v. City of Greenville, Miss.*, 775 F.3d 731, 736 (5th Cir. 2015)).

The first prong of this inquiry is whether Matthews spoke as a citizen or as a public employee. *See Graziosi*, 775 F.3d at 736-37. The outcome on this point is straightforward in this case, as there has been no argument that Matthews was speaking as a public employee pursuant to his official duties when making posts on his personal social media page. He was speaking as a citizen.

The second prong of the inquiry is whether his speech was "on a matter of public concern." *Brown*, 150 F. Supp. 3d at 761. "Speech involves a matter of public concern if it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Graziosi*, 775 F.3d at 738 (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)) (additional citation omitted). This analysis involves an evaluation of the "content, form, and context of a given statement, as revealed by the whole record." *Id*. (citing *Connick*, 461 U.S. at 147-48, 103 S. Ct. 1684).

On this point, the Defendants attack Matthews' allegations, specifically arguing that he "never even alleges the specific protected speech" or "the specific timeline for such[.]" [52] at p. 20. Before analyzing whether Matthews' allegations satisfy this standard, the Court must take a closer look at the specific allegations of the Amended Complaint [47] to identify the precise speech at issue. This is critical because "a plaintiff must do far more than make boilerplate assertions that he engaged in First Amendment-protected activity." *Boisseau v. Town of Walls, Miss.*, 138 F. Supp. 3d 792, 801 (N.D. Miss. 2015). "[T]he Fifth Circuit has required that plaintiffs state

*specifically* what activity they engaged in that enjoys First Amendment protection, and it has carefully scrutinized their allegations in that regard." *Id*. (citing *James v. Texas Collins Cnty.*, 535 F.3d 365, 376 (5th Cir. 2008)) (emphasis added).

Against this backdrop, the Court reiterates Matthews' specific allegations in the Amended Complaint [47] as to the speech in which he engaged:

> The Plaintiff made several public verbal statements and social media posts regarding the
>
>     a.     performance of Defendant Collins including repeated flooding operability [sic] of county flood control pumps in District 5;
>
>     b.     Board President Reginal Moore being charge[d] with multiple Driving Under the Influence of Intoxicating Substances while in office;
>
>     c.     Misuse of county equipment to build a private road that leads to a restaurant owned by Supervisor Eric Mitchell in District 4;
>
>     d.     Plaintiff also made a statement regarding Robert Collins's participation in a grievance hearing of an employee who qualified to run against him in the 2023 democratic primary election and his subsequent voting to terminate that employee in June 2023. The Plaintiff also attended the employee's grievance hearing;
>
>     e.     Defendant Leflore County secretly hired someone for the Assistant Purchasing Clerk Position without advertising the position to the public;
>
>     f.     A social media [post of] side by side ATVs purchased for Board of Supervisors, which was viewed by Plaintiff as wasted assets of an already financially strained county.

*Id*. at p. 4-5.

Although (to the Defendants' point) the allegations of the Amended Complaint [47] lack specific dates, Matthews attached to the filing copies of the social media posts—many of which

13

do include dates. The Court will walk through those posts in the order that he attached them in his collective exhibit.[2]

As to his speech relating to deficiencies with flood control pumps (for which he claims Collins is responsible), Matthews attached specific social media posts he made on August 1 and August 8. *See* [47], Ex. 2 at p. 1-8. Although the posts only include a month and day (not the year), when viewed in the context of the Amended Complaint [47], Matthews clearly is alleging they were made in August 2023—just weeks prior to his termination.

The August 8 posts include pictures of flooding and one post from that date states: "Look Supervisor Collins its [sic] raining on election day where the pumps? People in Glendale in arounding [sic] this rain should be awake call for you people [sic] go show Robert Collins he drop the assignment your word ain't s… ." *Id*. at p. 2. Similarly, another post that Matthews made a week prior on August 1 includes a picture of a pumping station with the explanation "This pumping station out of operation 5 months panal [sic] boxes on ground, meter on ground, make sure u take Congressman Bennie to Glendale n show this Supervisor Collins[.]" *Id*. at p. 8.

Matthews also attached a July 26 post he made that was clearly directed toward Mitchell (and included a picture of one of Mitchell's campaign signs). *Id*. at p. 9. The picture includes a dump truck, and Matthews wrote "U didn't call the Greenwood Commonwealth to take a pic of you putting down new [pavement] on a private road next door to your [] restaurant[.]" *Id*. Another post from that same day includes a different picture of a new road being paved with Matthews' caption "Taxpayers MONEY." *Id*. at p. 11.

---

[2] The Court recognizes that the dates on which Matthews engaged in the particular speech at issue is more directly related to the fourth element—whether the speech "precipitated the adverse employment action." *Johnson*, 126 F.4th at 1029. While it will address that point in connection with the fourth element, the Court also does so here so as to provide context to Matthews' statements.

Additionally, Matthews attached a post he made on October 11, 2022 that included a picture of three ATVs and contained a caption indicating that the same was a waste of taxpayer money by the Board of Supervisors. *Id*. at p. 12.

An additional post from October 12, 2022 specifically criticizes the County's failure to advertise before hiring an individual for an assistant clerk position. *See id*. at p. 13.

In November 2022, Matthews also criticized the Board as being responsible for the closing of a hospital in the County. *See id*. at p. 14-15.

The last two pages of the collective exhibit are posts that Matthews made but are not dated. They state: "Supervisor Collins You Know Derrick Chambers running of the SAME Position TO be The Supervisor of District 5 N U GO N VOTE Yes TO TERMINATE Him WHAT U THINKING [] WELL HERE COME THE LAWSUIT LEFLORE ALL READY BROKE" and "Supervisor Reggie Moore u didn't [lose] your Supervisor job when u was OUT DRIVING DRU[N]K WHERE WAS THE OTHER TWO MIGOS TO SPEAK ON THAT, HELLO[.] *Id*. at p. 16-17.

As a separate exhibit, Matthews also attached to his Amended Complaint [47] a photograph of campaign signs for political opponents of the Individual Defendants that he alleges were displayed on his personal property leading up to the August 8, 2023 primary election. *See* [47], Ex. 1.[3]

---

[3] As an aside, the Court notes that, in addition to his social media posts, Matthews' Amended Complaint [47] also alleges that the termination was based on his "supporting political candidates against Defendants Gary, Moore, Mitchell, and Collins." [47] at p. 12, 13. "Because political belief and association constitute the core of those activities protected by the First Amendment, the practice of patronage dismissals clearly infringes First Amendment interests." *Garza v. Escobar*, 972 F.3d 721, 729 (5th Cir. 2020) (citation and quotation marks omitted). Although the Defendants do not raise any argument that political activities do not constitute protected speech, the Court notes this point, as it may potentially become an issue later in this litigation.

15

Contrary to the Defendants' assertions, these constitute *specific* examples of speech in which Matthews engaged and the timeline can be gathered by reviewing them in conjunction with the factual allegations of the Amended Complaint [47]. The speech involves the performance of elected officials and other allegedly improper expenditures of public funds (in addition to displaying campaign signs on his personal property). "The Fifth Circuit has held time and again that 'speech reporting official misconduct, wrongdoing, or malfeasance on the part of public officials involves matters of public concern.'" *Carter v. City of Jackson, Miss.*, 707 F. Supp. 3d 636, 646 (S.D. Miss. 2023) (quoting *Branton v. City of Dallas*, 272 F.3d 730, 745 (5th Cir. 2001)). Recently, the Fifth Circuit has reiterated that "there is perhaps no subset of matters of public concern more important than bringing official misconduct to light." *Johnson*, 126 F.4th at 1029. This Court has no trouble concluding that Matthews' speech, in the form of his social media posts, criticizing the performance of elected officials and pointing out perceived misconduct in which they engaged involved a matter of public concern.

Matthews has pled sufficient facts to support the second element of his First Amendment retaliation claim.

The third element involves application of the *Pickering* balancing test. *See Carter*, 707 F. Supp. 3d at 648 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)). This test requires the reviewing court to "determine whether the interest of the employer 'in promoting the efficiency of the public services in performs through its employees' outweighs [the plaintiff's] and the public's interest in the speech.'" *Id*. (quoting *Moore v. City of Kilgore*, 877 F.2d 364, 372 (5th Cir. 1989)).

The Defendants make minimal to no argument on this point for purposes of the present Motions [51, 53]. The Court therefore will not engage in a full *Pickering* balancing test at this time

16

but instead concludes, for purposes of the present stage of the proceedings only, that Matthews has met his pleading burden.

The Court next looks to the fourth element, which requires a causal link between the speech and the adverse employment action. *Johnson v. Clarksdale Pub. Utilities Comm'n*, 807 F. Supp. 3d 593, 608 (N.D. Miss. 2025). Addressing this element in the summary judgment context, this Court has recently explained that "[t]he fourth element requires proof that the protected speech was a substantial or motivating factor in the adverse action. Even if a retaliatory motive exists, a plaintiff is required to show the motive was the but-for cause, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Id*. (citations omitted).

On this point, the Defendants contend that it was not Matthews' speech that caused his termination but, rather, that the termination decision was based on his conduct at the Circuit Clerk's office on August 30, 2023. In support, they point to the termination letter, which specifically advised Matthews that "[o]n August 30, 2023 at approximately 10:34 AM, you walked into the Circuit Clerk's office/courthouse whereas a disturbance was created causing security/on duty deputies to intervene and restore peace while escorting you out of the building." [47], Ex. 3 at p. 1. The Defendants therefore argue that Matthews' disruptive conduct at the Circuit Clerk's office that day "was not protected speech under the First Amendment in any manner." [52] at p. 21.

But there are multiple flaws with this argument, at least for purposes of this stage of the proceedings. First, Matthews' allegations in the Amended Complaint [47] regarding the August 30, 2023 event, which the Court must take as true at this stage of the proceedings, are in stark

17

contrast to the Defendants' portrayal of them. For instance, he alleges that it was Stockstill who instigated the events that occurred that day. *See* [47] at p. 7-8.

More critically, Matthews' contention is *not* that he was terminated for his conduct on August 30, 2023—in fact, he specifically alleges that he was terminated for his speech "regarding both the County Supervisors and Leflore County's performance and ethics . . . and by supporting political candidates against Defendants Gary, Moore, Mitchell, and Collins." [47] at p. 13. In other words, he takes the position that the August 30, 2023 incident is not the real reason for his termination.

To support this position, Matthews points out that the disciplinary action report that he received at the time of his termination stated that it contained corroborating statements regarding the August 30, 2023 incident but that no such statements were actually provided. He contends that the statements he later received were fabricated by Gary as a way to justify the termination decision.

Additionally, Matthews points out that the Defendants make a related argument that he had already received a final written warning at the time of the August 30, 2023, incident, which they contend further bolsters the basis for the termination. Matthews argues that the Defendants' contention on this point is simply false. Notably, the termination letter Matthews received made no mention of any prior incidents of him having received a final written warning. Additionally, the disciplinary action report delivered with Gary's letter specifically selected "no" in response to the form question of "Has the employee ever been disciplined on this or a similar problem in the past?" [47], Ex. 3 at p. 2. The Court reiterates that, at this juncture, it must construe these allegations in the light most favorable to Matthews. *See*, *e.g.*, *Hickman v. City of Newton, Miss.*,

18

2025 WL 1699359, at *4 (S.D. Miss. June 17, 2025) (quoting *Guerra v. Castillo*, 82 F.4th 278, 282 (5th Cir. 2023)).

This Court has recognized that the "causation element in First Amendment retaliation cases often presents factual disputes not well suited for summary disposition." *Johnson*, 807 F. Supp. 3d at 609 (citing *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998)). This case is only at the judgment on the pleadings stage. Although Matthews will undoubtedly be tasked with providing factual evidence of a causal link between his speech and the termination decision, he has adequately alleged it for purposes of precluding dismissal at this time. The fourth element is satisfied for purposes of this stage of the proceedings.

"Once a plaintiff has met his burden of showing that his protected speech was a substantial or motivating factor in the defendant's adverse employment decision, a defendant may still avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of the protected speech." *Haverda v. Hays Cnty.*, 723 F.3d 586, 591-92 (5th Cir. 2013) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)). Leaning into this defense, the Defendants again point to Matthews' disruptive behavior at the Circuit Clerk's office on August 30, 2023, and argue that, even setting aside Matthews' prior speech, the incident created an independent basis for his termination. But, again, this argument presupposes that Matthews engaged in disruptive behavior on August 30, 2023. It also ignores the reality that the entire premise of Matthews' lawsuit is that his prior protected speech was the real reason for his termination and that the Defendants' reliance on the August 30, 2023 incident is pretextual. *See id*. (quoting *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991)) ("An employee can, however, refute [the same adverse employment action

19

defense] by presenting evidence that 'his employer's ostensible explanation for the discharge is merely pretextual.'").

Again, Matthews will bear the burden to come forward with proof to substantiate his allegations in this regard. But for purposes of this stage in the proceedings, he has alleged sufficient facts to preclude dismissal. Ultimately, he has pled a constitutional violation.

### C.    Qualified Immunity/Municipal Liability

Having concluded that Matthews has pled a First Amendment retaliation claim, the Court next turns to the Defendants' separate defenses. The Individual Defendants contend that qualified immunity precludes liability against them, and the County alleges that it cannot be held liable because Matthews has not alleged any official action that can be imputed to it. The Court will address these arguments separately, as wholly different considerations and standards are at play.

### i.    Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wetherbe v. Tex. Tech Univ. Sys.*, 138 F.4th 296, 301 (5th Cir. 2025) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).

Because the Court has already concluded that Matthews has pled a violation of his First Amendment rights, the Court turns to the clearly established prong.

"A governmental official 'violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lewis v. Walley*, 168 F.4th 327, 332 (5th Cir. 2026) (quoting *Aschroft*, 563 U.S. at 741, 131 S. Ct. 2074). "Qualified immunity is

20

inappropriate only where the [government official] had 'fair notice'—'in light of the specific context of the case, not as a broad general proposition'—that his particular conduct was unlawful." *Wetherbe*, 138 F.4th at 301 (quoting *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019)) (additional citation omitted). To that end, "courts must not 'define clearly established law at too high a level of generality.'" *Carrasco v. Henkell*, 2023 WL 3270908, at *3 (5th Cir. May 5, 2023) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021); (citing *Morgan v. Swanson*, 659 F.3d 359, 373 (5th Cir. 2011)). Rather, the right "must be framed 'with specificity and granularity.'" *Id.* (quoting *Morrow*, 917 F.3d at 874-75). Ultimately, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Wetherbe*, 138 F.4th at 301 (citations and internal quotation marks omitted).

After articulating the applicable law for analyzing a qualified immunity defense, the entirety of the Defendants' argument on this point is as follows:

> Here, the burden is on Plaintiff to provide a case which would have provided fair notice to Defendants that each of them could be held individually liable for Gary terminating an employee due to the employee engaging in blatantly disruptive misconduct on County property inside [the] Courthouse, not to mention doing so after having already received a "Final Written Warning" months prior for the same misconduct which was corroborated by a police report, in accordance with clearly enumerated policies which provided that termination was proper for the employee's misconduct such as "disturbance on County property or at any place at which work is being performed by or for the County", "additional violation of any County rule or policy after receipt of previous warnings or discipline", "Insubordination", and Discourtesy to the public of another employee." In fact, Defendant Gary acted objectively reasonably, legitimately, and in accordance with explicit policies which clearly stated that "Individuals who commit such acts" like disruptive behavior, threats and intimidation, "may be removed from the premises" and "subject to disciplinary action, up to and including termination." Accordingly, the Individual Defendants are

21

entitled to qualified immunity, and dismissal with prejudice is proper.

[52] at p. 28 (emphasis omitted).

But, as with their causation argument, this position misses the mark as to the specific allegations in Matthews' Amended Complaint [47]. Again, Matthews' position is that reliance on the August 30, 2023 incident as the basis for his termination is a mere pretext for the real reason, which was his protected speech in the preceding months. As noted previously, Matthews has alleged some basis for this theory, including the failure to include any statements with the disciplinary action report and the report itself indicating that Matthews had not "ever been disciplined on this or a similar problem in the past." [47], Ex. 3 at p. 2. Additionally, although the Defendants now contend that Matthews had already received a final written warning which supported the termination decision, the termination letter made no reference to the same.

As the Fifth Circuit has time and again made clear, the reviewing court's function at this stage is to take the plaintiff's allegations as true. *See*, *e.g.*, *Clark v. Thompson*, 850 F. App'x 203, 210 (5th Cir. 2021) (noting that "we must, at [the motion to dismiss] stage, determine whether the officers are entitled to qualified immunity based on the facts alleged in the complaint, which we must accept as true, drawing all reasonable inferences in favor of' the plaintiff[.]") (citations and quotation marks omitted); *Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011) ("At this early pleading stage, our factual universe is bounded by the four corners of the complaint. In other words, we must determine whether the principals are entitled to qualified immunity based on the facts alleged in the complaint, which we must accept as true, drawing all reasonable inferences in favor of the students.") (citations omitted).

Applying that standard, the Court's inquiry is whether it constitutes a violation of clearly established law to terminate (in the context of Gary) or exert pressure on the decisionmaker to

22

terminate (in the context of Collins, Mitchell, and Moore) an employee because an employee engaged in protected speech related to the performance of the officials and the County as a whole. It does.

A 2008 decision from the Fifth Circuit is instructive. *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008). There, Shelton Charles, who previously held a systems analyst position with the Texas Lottery Commission, filed a First Amendment retaliation lawsuit after his employment was terminated by Gary Grief, an upper-level official within the Commission. *Id*. at 509. As to the underlying facts, in October 2005, Charles "sent an e-mail to high-ranking Commission officials, including Grief, raising concerns about racial discrimination and retaliation against him and other minority employees of the Commission." *Id*. at 510. After receiving no response, he sent follow-up emails the following month. *Id*. Thereafter, Grief "directed Charles to meet with his immediate supervisor and a human resources manager to answer questions regarding the emails." *Id*. The Fifth Circuit articulated the subsequent events as follows:

> When those two began to question Charles about the e-mails, he requested that the Commission's questions be put in writing so that he could respond in writing. According to allegations by Charles, one of the representatives of the Commission agreed to do so; but later that same day, Grief appeared unannounced in Charles's office and fired him on the spot. Grief handed Charles a written statement to the effect that he was being fired for insubordination, specifically for his "refusal to respond to the direct requests from his immediate supervisor."

*Id*.

Charles filed suit, contending that his e-mails were protected speech that ultimately caused the termination. *Id*. After the district court denied Grief's request for dismissal based on qualified immunity, he filed an interlocutory appeal. *Id*. at 511.

On appeal, the Fifth Circuit specifically held that "[t]erminating an employee for engaging in protected speech, of which Charles accuses Grief, is an objectively unreasonable violation of such an employee's First Amendment rights." *Id*. The court went on to note that "[w]hether Grief's actions were reasonable depends on his real reason for firing Charles; and the district court determined that Charles had introduced sufficient evidence to establish a genuine issue of material fact as to causation, *viz*., whether he was fired for (1) being insubordinate (as Grief maintains), or (2) his speech (as Charles insists)." *Id*. at 512.

The case at bar is in many ways similar to *Grief*. In particular, the parties submit quite divergent versions of events and, as a result, motivations for the termination decision. The heart of their dispute goes to intent, which is certainly not an issue for this Court to resolve at this stage of the proceedings. For now, the Court emphasizes the Fifth Circuit's clear articulation that "[t]erminating an employee for engaging in protected speech . . . is an objectively unreasonable violation of such an employee's First Amendment rights." *Id*. at 511.

The Fifth Circuit has reiterated this point on other occasions. *See*, *e.g.*, *Haverda v. Hays Cnty.*, 723 F.3d 586, 599 (5th Cir. 2013) ("[T]here is no doubt that [the plaintiff] had a clearly established constitutional right not to be fired for engaging in protected speech."); *see also Kostic v. Texas A&M Univ. at Commerce*, 11 F. Supp. 3d 699, 722 (N.D. Tex. 2014) ("At the time of the alleged violation of Plaintiff's First Amendment rights in 2009 and later, both Supreme Court and Fifth Circuit law clearly proscribed retaliation by a government employer against an employee for engaging in protected speech.") (citations omitted).

Ultimately, Matthews has alleged sufficient facts to support that he engaged in protected speech when he made public critical comments as to the conduct of Collins, Mitchell, and Moore and the Board as a whole. And, at the time of Matthews' termination in August 2023, the law was

24

clearly established that a retaliatory termination based on that speech would violate his First Amendment rights. *See*, *e.g.*, *Davis*, 518 F.3d at 317. Qualified immunity is not warranted on these facts, at least at this stage of the proceedings.

In reaching this conclusion, the Court notes that Matthews' allegations as to the precise conduct in which Gary engaged differed from the conduct of Collins, Mitchell, and Moore. For instance, he contends that it was Gary who made the ultimate termination decision, whereas Collins, Mitchell, and Moore exerted pressure on him to do so. Typically, in conducting a qualified immunity analysis, this Court considers the allegations separately as to the particular conduct of each government official; however, Matthews' allegations as to the Individual Defendants' wrongful conduct—namely, scheming and pressuring to have his employment terminated because of his protected speech critical of them, are the same for these Defendants. Furthermore, the Individual Defendants' arguments in favor of dismissal are grouped together. Therefore, the Court finds it appropriate to consider them together, at least at this stage of the proceedings.

Construing the allegations of the Amended Complaint [47] in the light most favorable to Matthews, the Court finds that qualified immunity should not be extended to the Individual Defendants. Their request for dismissal on that basis is rejected. Matthews will be permitted to proceed on Count 3.

   ii.   *Municipal Liability*

"[A] municipality cannot be held liable under § 1983 solely because its employee committed a constitutional tort. In other words, a plaintiff cannot prevail on a theory of *respondeat superior*." *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). Precedent is clear that "to hold a municipality liable under § 1893, the plaintiff must prove three

25

elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy or custom." *Id*. (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell*, 436 U.S. at 694, 98 S. Ct. 2018).

Matthews makes two separate arguments as to the imposition of municipal liability. First, he contends that Gary was acting as an official policymaker, thereby imputing liability to the County. Alternatively, he argues that the County ratified Gary's termination decision when it refused to grant him a grievance hearing.

As to the first theory, the Amended Complaint [47] alleges that "Gary *as an official policymaker and decision maker* terminated Plaintiff." [47] at p. 10 (emphasis added). Although Matthews undoubtedly alleges that Gary is an official policymaker, the Court need not accept as true the *legal* allegations in his Amended Complaint [47]. *See Ashcroft*, 556 U.S. at 678, 129 S. Ct. 1937 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

In essence, Matthews' contention is that the "single incident exception" to municipal liability is applicable. Describing this exception, the Fifth Circuit has recognized that "a single decision by a policymaker may, under certain circumstances, constitute a policy for which a municipality may be liable." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 366 (5th Cir. 2020) (quoting *Brown v. Bryan Cnty.*, 219 F.3d 450, 462 (5th Cir. 2000)). Additionally, the Fifth Circuit characterized the exception is "extremely narrow" and noted that a plaintiff "must show (1) the [] decision was made by a final policymaker, and (2) a plainly obvious consequence of the decision is a constitutional violation." *Id*. (citations and internal quotation marks omitted).

26

Concerning the first prong, the County heavily relies on the distinction between policymaking authority and delegated policy-implementing authority. The Fifth Circuit addressed that point in *Doe*:

> As for the first prong—the hiring decision must be made by a final policymaker—it's critical to distinguish between an exercise of policymaking authority and an exercise of delegated discretionary policy-implementing authority. *The former can trigger § 1983 municipal liability; the latter cannot*. Here, a hiring administrator screened Hernandez's application and decided to hire him. Unlike the Board, this administrator is not a final policymaker; rather, he or she has only been delegated discretionary policy-implementing authority. By limiting the single decisions that trigger municipal liability to those made by final policymakers, we avoid imposing *respondeat superior* liability, which the Supreme Court has rejected in the § 1983 context.

*Id*. (citations and quotation marks omitted; emphasis added).

Whether an official possesses policymaking authority is a question of state law. *Sweetin v. City of Texas City, Tex.*, 48 F.4th 387 (5th Cir. 2022). The County points to Mississippi statutory law to support its argument that a county administrator possesses only the authority delegated by the Board. Conversely, Matthews contends that further factual development is necessary to determine the extent of the Board's delegation and whether it retained some authority over Gary's final decisions.

But the Court need not even dive into those issues at this time, as Matthews' ratification theory adequately alleges municipal liability for purposes of this stage of the proceedings.

As to ratification, the Fifth Circuit has held that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Young v. Bd. of Supervisors of Humphreys Cnty., Miss.*, 927 F.3d 898, 903 (5th Cir. 2019) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)). The Fifth Circuit went on to clarify that "unless the

27

subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification . . . is insufficient to establish an official policy or custom." *Id.* (quoting *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009)).

Here, Matthews asserts that the ratification theory is applicable because the Board, as the final policymaker, denied his request for a grievance hearing after the termination, thereby ratifying his termination. And although the Fifth Circuit in *Young* made clear that the ratification theory is not an easy threshold to meet, the Court has already held that Matthews' Amended Complaint [47] does indeed allege a "violation of clearly established law." *Id.*

The County contends that the ratification theory still is not applicable because the Board did not formally deny a request for a hearing in its minutes. But in reviewing Matthews' allegations and the exhibits attached to his Amended Complaint [47], there is at a minimum a plausible allegation that the Board ratified the termination decision. The initial termination letter, which was written on the letterhead of the Board of Supervisors, described the manner in which Matthews could request to meet with the Board and further explained that, if such a request was made, "[t]he County Administrator shall convey the request to the Board of Supervisors at the next official meeting, and the Board of Supervisors shall determine whether any action should be taken." [47], Ex. 3 at p. 1.

Matthews made such a request and was assured via responsive letter from Pulley (who again was acting as the attorney for the Board), that the Board would allow him an opportunity to appear but that the request would not be a full grievance hearing. There is additional correspondence between Dorsey and Pulley, wherein Matthews requested that the Board reconsider that decision. Ultimately, Matthews alleges that he was not provided a grievance

28

hearing, despite the fact that it was customary in the County for the Board to grant such a request. Although the precise communications regarding Matthews' request and the Board's response thereto are unknown at this time, it is plausible that the Board was cognizant of Matthews' disagreement with the termination decision yet took no action to address it. Viewing these facts in the light most favorable to Matthews, this could constitute a ratification of Gary's termination decision. Furthermore, the reality is that this case presents a unique factual circumstance where the crux of Matthews' entire Amended Complaint [47] is that three members of a five-member Board orchestrated his termination in retaliation for his protected speech.[4]

Taking all of this into account, the Court finds that Matthews has adequately pled a plausible theory of municipal liability as to the County. Matthews will be permitted to proceed on Count 1.

### III. State Law Claim

In Count 2, Matthews asserts a claim for malicious interference with employment against the Individual Defendants. Specifically, the Amended Complaint [47] alleges that "Gary maliciously interfered with Plaintiff's employment by firing him based on [his exercise of] his First Amendment rights by speaking as a private citizen in matters of public concern[.]" [47] at p. 12. As to Moore, Collins, and Mitchell, Matthews' theory is that they are liable for "exerting a pressure campaign on [Gary]" to terminate him. *Id*.

To prevail on a malicious interference claim, a plaintiff must show four elements:

> (1) that the acts were intentional and willful; (2) that they were
> calculated to cause damage to the plaintiff in his lawful business; (3)
> that they were done with the unlawful purpose of causing damage

---

[4] While not raised by the parties, the Court also points out that, in addition to holding the title of County Administrator, Gary was also the Chancery Clerk. It would be improper for the Court to making any findings on that point at this time, but it trusts that the parties will address that point in future filings in this litigation, if any.

and loss, without right or justifiable cause (which constitutes malice); and (4) that actual damage and loss resulted.

*Jones v. Miss. Valley State Univ.*, 2021 WL 5629227, at *7 (N.D. Miss. Nov. 30, 2021) (quoting *Protective Serv. Life Ins. Co. v. Carter*, 445 So.2d 215, 217 (Miss. 1983)).

As with their arguments in connection with the merits of Matthews' First Amendment retaliation claim, the Defendants contend that Matthews cannot prevail because Gary had a legitimate basis to terminate him for his disruptive conduct at the Circuit Clerk's office on August 30, 2023. Again, though, this argument goes beyond the scope of the Court's inquiry at the judgment on the pleadings stage, as Matthews' Amended Complaint [47] clearly alleges that he did *not* engage in any such behavior that day. Rather, he contends that the real reason underlying his termination was that Collins, Mitchell, and Moore exerted pressure on Gary to terminate him because he had engaged in protected speech critical of their performance and of the County as a whole. *See* [47] at p. 12 ("Moore, Mitchell, and Collins maliciously interference with Plaintiff's employment by exerting a pressure campaign on Defendant Gary to influence Plaintiff's termination based on their animosity against Plaintiff for exercising his First Amendment rights[.]"). Matthews contends that their conduct was intentional, calculated to cause Gary to terminate him, and that Gary in fact did so. He has adequately alleged a malicious interference with employment claim against them.

One separate argument is applicable to Gary only as the individual who made the termination decision. Specifically, "a supervisor is privileged to interfere with an employee's employment contract unless the supervisor's actions are taken in bad faith." *Jones*, 2021 WL 5629227 at *7 (citing *Wigginton v. Washington Cnty., Miss.*, 2013 WL 3157565, at *9 (N.D. Miss. June 20, 2013)).

Gary's request for dismissal on this basis fails at this juncture. The Amended Complaint [47] indeed does allege facts that, taken as true, support the proposition that Gary acted in bad faith by terminating a longstanding employee at the behest of Board members of whom the employee had been critical.

Whether Matthews is ultimately able to prevail on the claim is a separate question, but he has adequately alleged a viable claim. He will be permitted to proceed on Count 2.

*Conclusion*

The Motions [51, 53] are DENIED. However, despite reaching this ultimate conclusion, the Court does find some merit to one aspect of the Defendants' position. To the extent that they attack other more generalized assertions concerning the speech at issue (outside of the *specific* speech addressed herein) in the Amended Complaint [47], such as that Matthews "made several public verbal statements" or that "[i]n the months prior to August 8, 2023, [he] was actively campaigning for the opponents of Gary, Collins, Moore, and Mitchell," the Defendants' arguments are well-taken. [47] at p. 4, 6. These generalized allegations fall below the requisite pleading standard. In proceeding in this litigation, Matthews shall be limited to the *specific* speech addressed in this Order and Memorandum Opinion. The Court trusts that the parties will bear that in mind when proceeding in this case.

The stay of this case is hereby LIFTED. The Magistrate Judge will hold a case management conference in due course.

SO ORDERED, this the 28th day of July, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE

31